# EXHIBIT A

YANO RUBINSTEIN (State Bar No. 214277)
yano@rublaw.com
KYMBERLEIGH N. KORPUS (State Bar No. 217459)
kkorpus@rublaw.com
RUBINSTEIN LAW
2021 Fillmore Street #2260
San Francisco, CA 94115
Telephone:   415.967.1970
Facsimile:    415.236.6409

Attorneys for Plaintiff ROMAIN PELLERIN

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

UNLIMITED JURISDICTION

| | |
|---|---|
| ROMAIN PELLERIN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>INPUT OUTPUT GLOBAL, INC., a Wyoming corporation (formerly Delaware);<br><br>INPUT OUTPUT GLOBAL SINGAPORE PTE. LTD, a Singapore corporation;<br><br>INPUT OUTPUT HK LIMITED, a Hong Kong corporation;<br><br>IOHK USA LLC, a Wyoming limited liability company; and<br><br>DOES 1-200, inclusive,<br><br>Defendants. | Case No.:<br><br>**PLAINTIFF ROMAIN PELLERIN'S COMPLAINT FOR:**<br><br>(1) **BREACH OF CONTRACT**<br>(2) **BREACH OF IMPLIED;COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>(3) **RETALIATION IN VIOLATION OF PUBLIC POLICY;**<br>(4) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>(5) **VIOLATION OF CALIFORNIA LABOR CODE;**<br>(6) **UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200);**<br>(7) **PROMISSORY ESTOPPEL;**<br>(8) **FRAUDULENT CONCEALMENT;**<br>(9) **CONVERSION;**<br>(10) **UNJUST ENRICHMENT; AND**<br>(11) **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

PELLERIN COMPLAINT                                    1

1    Plaintiff ROMAIN PELLERIN ("Pellerin" or "Plaintiff") asserts the causes of action
2    contained in this Complaint against Defendants INPUT OUTPUT GLOBAL, INC. ("IOG"),
3    INPUT OUTPUT GLOBAL SINGAPORE PTE. LTD ("IOG Singapore"), INPUT OUTPUT HK
4    LIMITED ("IOHK"), IOHK USA LLC ("IOHK (USA)"), and DOES 1-200, inclusive, as further
5    alleged herein:

## JURISDICTION AND VENUE

1. On information and belief, this Court has personal jurisdiction over the Defendants because each of them resides in and/or conducts business within the State of California, either individually, or through one of the other Defendants they use as their alter-ego. In addition, the written agreements at issue in this action were executed in the State of California, and such agreements further required performance thereunder to be rendered by the parties within the State of California, and most of the injuries were caused within the State of California.

2. On information and belief, this court has subject matter jurisdiction over all causes of action asserted herein pursuant to Article VI, §10 of the California Constitution and Code of Civil Procedure §§85, 86, and 410.10, by virtue of the fact that this is a civil action in which the matter in controversy, exclusive of interest, exceeds the minimum jurisdictional requirement of Twenty-Five Thousand Dollars ($25,000.00) and because each cause of action asserted arises under the laws of the State of California or is subject to adjudication in the courts of the State of California.

3. On information and belief, venue is proper in this Court under Code of Civil Procedure §§ 395 and 395.5 because (i) each of the Defendants operate within San Diego County, (ii) the action involves contracts entered into by the parties in San Diego County for which the Defendants performed obligations thereunder primarily within San Diego County, (iii) the action involves an employment contract and other contracts that were entered into, and primarily performed, within San Diego County, and (iv) substantial acts giving rise to this action occurred in this County.

## PARTIES

4. Plaintiff ROMAIN PELLERIN ("Pellerin") is, and at all times relevant herein

was, a resident of the State of California (until he relocated to Texas in June, 2025). At the time of the events giving rise to this action, Pellerin was employed by Defendants as Chief Technology Officer of Defendant IOG.

5. Defendant INPUT OUTPUT GLOBAL, INC. ("IOG") is, and at all times relevant herein was, a Delaware corporation domesticated in Wyoming, conducting business in California and throughout the United States. IOG is engaged in blockchain technology development and providing crypto currency services. IOG is related to and conducts business with IOG Singapore, IOHK, and IOHK (USA), and IOG operated together with those other entities and DOES 1-100 as an integrated enterprise (hereinafter the "IOG Group," a term which refers jointly to all named Defendants and DOES 1-100) managing Pellerin's employment (including Pellerin's PSU and other contractual rights alleged herein) throughout various corporate restructurings.

6. Defendant INPUT OUTPUT GLOBAL SINGAPORE PTE. LTD ("IOG Singapore") is, and at all time relevant herein was, a Singapore corporation conducting business in California and throughout the United Sates. IOG Singapore is related to and conducts business with IOG and IOHK, and IOHK (USA), and IOG Singapore operated together with those other entities and DOES 1-100 as part of the IOG Group, an integrated enterprise managing Pellerin's employment (including Pellerin's PSU and other contractual rights alleged herein) throughout various corporate restructurings.

7. Defendant INPUT OUTPUT HK LIMITED ("IOHK") is, and at all times relevant herein was, a Hong Kong corporation conducting business in California and throughout the United States. IOHK is related to and conducts business with IOG, IOG Singapore, and IOHK (USA), and IOG Singapore operated together with those other entities and DOES 1-100 as part of the IOG Group, an integrated enterprise managing Pellerin's employment (including Pellerin's PSU and other contractual rights alleged herein) throughout various corporate restructurings.

8. Defendant IOHK USA LLC ("IOHK (USA)") is, and at all time relevant herein was, a Wyoming limited liability company conducting business in California and throughout the United Sates. IOHK (USA) is related to and conducts business with IOG, IOG Singapore, and IOHK, and IOHK (USA) operated together with those other entities and DOES 1-100 as part of

the IOG Group, an integrated enterprise managing Pellerin's employment (including Pellerin's PSU and other contractual rights alleged herein) throughout various corporate restructurings.

9. The true names and capacities of Defendants sued herein as DOES 1 through 200, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of said Defendants is legally responsible for the events and happenings alleged in this Complaint.

10. Defendants DOES 1-200, inclusive, are sued herein under their fictitious names as their true names and capacities are not fully known. When the true names and capacities of the Defendants DOES 1-200, inclusive, are ascertained, Plaintiff will amend this Complaint by inserting the true names and capacities of such DOES 1-200, inclusive. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences and actionable conduct alleged herein and that they are liable to Plaintiff for the damages alleged herein and the relief sought herein, and that Plaintiff's damages as alleged herein were proximately caused by each of the fictitiously named Defendants.

11. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, there existed a unity of interest and ownership among Defendants and each of them, such that any individuality and separateness between Defendants, and each of them, ceased to exist. Defendants and each of them, were the alter egos of the other Defendants, and each of them, in that they controlled, dominated, and operated each other without any separate identity, observation of formalities, or other manner of division. To continue maintaining the facade of a separate and individual existence between and among Defendants, and each of them, would serve to perpetrate or sanction a fraud and promote injustice.

12. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendants and each of them were the agents, representatives and/or employees of each and every other Defendant. In doing the things hereinafter alleged, Defendants and each of them were acting within the course and scope of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent.

13. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendants and each of them were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each and every other Defendant, and the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission and consent of each and every other Defendant and that said conduct was thereafter ratified by each and every other Defendant, and that each of them is jointly and severally liable to Plaintiff.

14. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendants worked together to misused the corporate form in a series of transactions that operated as a shell game that was intended to, and did, extract value from IOG without compensating IOG or PSU holders, while trying to maintain the fiction that PSU holders were not entitled to receive their share of the value extracted because their interests were supposedly limited solely to the value remaining in the hollowed-out IOG entity. This manipulation of corporate structure to evade contractual obligations justifies piercing the corporate veil.

## FACTUAL ALLEGATIONS

*Employment Relationship and 2020 Phantom Stock Unit Plan Award*

15. In February 2020, Pellerin began working for Defendants as the IOG Group's Chief Technology Officer pursuant to a services agreement between IOHK and Pellerin's company (Slyseed SAS). That services agreement (the "2020 Services Agreement") was subsequently transferred on April 30, 2021 to IOG Singapore, with IOG Singapore replacing IOHK as a party to the 2020 Services Agreement.

16. On November 1, 2020, while Pellerin was a resident of California and still operating as the IOG Group's CTO (pursuant to the 2020 Services Agreement with IOHK), the IOG Group granted Pellerin a Phantom Stock Unit Plan Award that was effective June 1, 2020 (the "PSU Agreement") covering one percent (1%) of the company for the purpose of helping incentivize Pellerin to stay with the IOG Group and do what he could to increase the IOG Group's performance. A copy of this PSU Agreement is attached hereto as Exhibit A.

17. Under the PSU Agreement, Pellerin was entitled, upon (i) a "Change in Control" of the IOG Group and (ii) any interim dividends declared by the IOG Group) to receive certain payments, provided he still remained in continuous service at the time of such events. More specifically, (i) upon a "Change in Control," Pellerin was entitled to receive lump sum cash payment in the amount of 1% of the IOG Group's total value at the consummation of the Change in Control, and (ii) in the event the IOG Group declared a cash dividend, Pellerin was also entitled to the issuance to him of a dividend payment in an amount that would be calculated as if his 1% PSU constituted an actual 1% ownership interest in the IOG Group.

18. The PSU Agreement also clarified that the PSUs awarded therein were separate and apart from any other agreement that might be entered into with the IOG Group by stating that no other benefit plan or arrangement with the IOG Group could treat the value of the PSUs as compensation or earnings under such arrangement unless such plan or arrangement expressly authorized such treatment of the value of the PSUs.

19. Effective February 1, 2023, Pellerin entered into a direct employment agreement with IOHK (USA) to be employed as its CTO for a base salary of $380,000, with an annual discretionary bonus of $47,000 (the "Direct Employment Agreement"). A copy of this Direct Employment Agreement is attached hereto as Exhibit B. On information and belief, at the time the Direct Employment Agreement was executed, IOHK (USA): (i) was a successor in interest to IOG, (ii) an entity derived from IOG, (iii) constituted the most recent form of IOG after one or more Changes in Control, and/or (iv) hired (as an agent of IOG and/or the IOG Group) Pellerin as CTO of IOG and/or the IOG Group. In any event, at the time of the execution of the Direct Employment Agreement, Pellerin understood he was being directly hired to continue on as CTO of IOG and the IOG Group, and the Defendants all understood that Pellerin had that understanding when the Direct Employment Agreement was executed. Moreover, all parties to this litigation acted after the Direct Employment Agreement was executed in a manner consistent with the understanding thereafter that Pellerin was CTO of IOG and the IOG Group, and that Pellerin's 1% PSU was still valid (and that his continuous employment as IOG's and the IOG Group's CTO had not ended, up to and including the payment of dividends to Pellerin pursuant

to his PSU Agreement after execution of the Direct Employment Agreement.

20.     During the period spanning from early 2020 through the end of 2024, Pellerin received PSU dividend payments totaling approximately $956,000, paid irregularly when the IOG Group CEO (Charles Hoskinson) distributed formal dividends to himself out of the entities forming the IOG Group. These payments averaged approximately $239,000 annually.

*Corporate Restructuring to Avoid PSU Obligations*

21.     During the period 2020-2024, the IOG Group generated substantial revenue. However, beginning in 2021, on information and belief, substantial value was extracted from the IOG Group through various means, including use of company funds for the acquisition of assets that may now be held privately (though some, like a jet, may serve mixed business and personal purposes), while PSU holders like Pellerin received their contractual dividend payments on only formally declared dividends. Defendants continued to systematically restructure the IOG Group in manners designed to improperly minimize their obligations to PSU holders.

22.     Defendants restructured the IOG Group through a two-tier profit distribution system: 80% of all profits from the IOG Group entities flow to HFO (the Charles Hoskinson's family office), with only 20% allocated to various Employee Equity Funds. EEF0 ("Employee Equity Fund 0") contains profits from pre-2024 IOG Group entities and subsidiaries (Midnight/Shielded, cFund investments, and others), while EEF1 contains profits from subsequent IOG Group entities and subsidiaries. Pellerin received 40,246 shares in EEF0 funds out of 5 million total shares issued in those funds, reducing his 1% PSU to approximately 0.16% of only the limited subset of pre-2024 IOG Group entities and subsidiaries and assets included in EEF0, excluding ADA holdings, cash reserves, traditional investments, and all post-January 1, 2024 subsidiaries. In addition, Pellerin was told that EEF1 is pending creation and shares will be granted later in 2025 with a three-year vesting period starting in 2024. If Pellerin's employment terminates, he will likely receive no shares in EEF1 despite having already vested 1.5 years toward those funds. This, despite the fact that from 2020 though today, the IOG Group grew from 200 to 700 employees (while Charles Hoskinson extracted 80% of subsidiary profits).

23.     This corporate restructuring was designed to and did substantially reduce the

value of Pellerin's PSU rights. His 1% PSU entitled him to 1% of all IOG Group dividends paid out AND 1% of total IOG Group enterprise value upon each Change in Control. The restructuring constituted multiple Changes in Control—including transfers to HFO, creation of EEF structures, and employment transfers—yet Defendants paid nothing for these triggering events. Moreover, the restructuring reduced Pellerin's dividend rights to 0.8% of only 20% of profits from a limited subset of entities (EEF0), excluding ADA holdings, cash reserves, traditional investments, and all post-January 1, 2024 IOG Group entities and subsidiaries (EEF1). This represents more than a 6-fold reduction in value from the 1% share value he was promised, effectively destroying both his Change in Control and dividend rights under the PSU Agreement.

24. Defendants failed to properly compensate PSU holders for the reduction in value caused by this corporate restructuring.

*The Forced Settlement Attempt*

25. In July 2025, Defendants presented Pellerin with a "Bonus Agreement and Sunset of Phantom Stock Unit Plan Award" requiring him to waive all PSU rights in exchange for a salary increase and annual bonus.

26. The proposed settlement significantly undervalued Pellerin's PSU rights. While offering a $438,000 annual increase in salary and bonus, this number exactly matched Pellerin's historical average earnings from PSU dividends and bonuses over the past six years: $500,000 (2020), $1.2 million (2021), $50,000 (2022), $195,000 (2023), $200,000 (2024), and $46,758 (2025), totaling $2,191,750 or $438,000 annually. The proposed 'increase' was therefore no increase at all when to compared to what he had already been receiving, while requiring Pellerin to forfeit his 1% PSU rights that had generated these substantial payments and held future potential for far greater value. Moreover, the proposed settlement agreement failed to address the underpayment of dividends to Pellerin resulting from the Defendants' restructuring of the IOG Group to deprive the IOG Group of most of its value.

27. Pellerin signed the proposed settlement agreement on July 11, 2025, but exercised his contractual right to revoke the agreement within seven days as provided by the agreement's terms.

28. Pellerin properly revoked the agreement on July 18, 2025, by email to Defendants' counsel as required by the agreement.

*Retaliation Following Revocation*

29. Immediately following Pellerin's revocation of the settlement agreement, Defendants engaged in a pattern of retaliatory conduct designed to pressure Pellerin into exercising the proposed settlement agreement again. For example:

   a. Defendants cut off Pellerin's access to the IOG Group's computer systems and applications based on their fabricated and false allegations that he was improperly forwarding company property (when he was actually preserving his own employment and PSU records).

   b. The CEO (Charles Hoskinson) publicly humiliated Pellerin by forcibly removing him from a scheduled Google Meet video conference in front of business colleagues. Rather than allowing Pellerin to leave voluntarily or respond, the CEO kicked him out of the meeting, with the forced removal visible to all participants, creating an embarrassing and hostile work environment.

   c. Defendants demanded that Pellerin repay alleged "overpayments" of salary and threatened acceleration of a personal loan between Pellerin and the CEO.

   d. Defendants issued unilateral communications about Pellerin's employment status to the IOG Group employees without his consent, undermining ongoing settlement negotiations.

   e. On July 24, 2025, HFO suddenly 'paused' its promised $100,000 matching investment in Herd DAO, a project in which Pellerin had invested $100,000 in December 2024 (in reliance upon HFO's investment commitment). HFO had worked with Herd DAO's lawyers for weeks to adapt bylaws. This last-minute withdrawal, after Pellerin paid over $98,000 in team salaries since January 2025, was designed to undermine both Pellerin's investment and the project's success as further retaliation.

30. This pattern of retaliation occurred specifically because Pellerin exercised his contractual right to revoke the settlement agreement and sought legal counsel to protect his interests.

**FIRST CAUSE OF ACTION**

[BREACH OF CONTRACT]

(As to All Defendants)

31. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

32. The PSU Agreement constituted a valid and enforceable contract between Pellerin and Defendants.

33. Pellerin performed all conditions, covenants, and promises required on his part under the PSU Agreement.

34. Defendants breached the PSU Agreement by:

   a. Failing to properly calculate and pay PSU dividends based on the IOG Group's actual financial performance;

   b. Failing to pay Pellerin 1% of the IOG Group's total enterprise value upon multiple Changes in Control, including the corporate restructurings that transferred assets to HFO and employment obligations to other entities.

   c. Engaging in corporate restructuring specifically designed to reduce PSU interest values;

   d. Extracting company assets to avoid paying PSU obligations; and

   e. Failing to treat PSU holders "as if" they constituted actual ownership for dividend purposes.

35. As a direct and proximate result of Defendants' breach, Pellerin has suffered damages in an amount exceeding several million dollars, to be proven at trial.

///

///

///

## SECOND CAUSE OF ACTION

[BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING]

(As to All Defendants)

36. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

37. The PSU Agreement and employment relationship contained an implied covenant that neither party would do anything to interfere with the other party's right to receive the benefits of the agreement.

38. Defendants breached the implied covenant by engaging in corporate restructuring specifically designed to avoid PSU obligations, extracting valuable assets to a family office entity, and creating artificial limitations on PSU value.

39. Defendants' conduct was undertaken in bad faith and was designed to deprive Pellerin of the substantial benefits he was entitled to receive under the PSU Agreement.

40. As a direct and proximate result of this breach, Pellerin suffered damages in an amount to be proven at trial, and is entitled to punitive damages for Defendants' bad faith conduct.

## THIRD CAUSE OF ACTION

[RETALIATION IN VIOLATION OF PUBLIC POLICY]

(As to all Defendants)

41. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

42. California public policy protects employees' rights to exercise contractual rights and seek legal counsel without retaliation.

43. Pellerin engaged in protected activity by exercising his contractual right to revoke the settlement agreement and seeking legal counsel to protect his interests.

44. Defendants retaliated against Pellerin by cutting off his system access, publicly humiliating him, demanding repayment of alleged overpayments, threatening loan acceleration, making false trade secret accusations, creating a hostile work environment, and suddenly

'pausing' its promised $100,000 matching investment in Herd DAO, a project in which Pellerin had invested $100,000 in December 2024 (in reliance upon HFO's investment commitment).

45. Defendants' retaliatory conduct was in direct response to Pellerin's exercise of his legal rights and violated fundamental public policy.

46. As a direct and proximate result of Defendants' retaliation, Pellerin suffered damages including emotional distress, humiliation, and interference with his employment relationship.

**FOURTH CAUSE OF ACTION**

[INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS]

(As to All Defendants)

47. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

48. Defendants intentionally engaged in extreme and outrageous conduct by publicly humiliating Pellerin, making false accusations about his conduct, threatening his financial security, creating a hostile work environment, and suddenly 'pausing' its promised $100,000 matching investment in Herd DAO, a project in which Pellerin had invested $100,000 in December 2024 (in reliance upon HFO's investment commitment).

49. Defendants' conduct was beyond the bounds of decency and was utterly intolerable in a civilized society.

50. Defendants intended to cause emotional distress, or acted with reckless disregard for the probability that emotional distress would result.

51. As a direct and proximate result of Defendants' conduct, Pellerin suffered severe emotional distress, humiliation, and damage to his professional reputation.

**FIFTH CAUSE OF ACTION**

[VIOLATION OF CALIFORNIA LABOR CODE]

(As to All Defendants)

52. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

53. Defendants violated California Labor Code § 1198.5 by denying Pellerin access to his personnel files and employment records after July 18, 2025. 55. This denial prevents Pellerin from documenting his employment history and PSU rights.

54. Defendants violated California Labor Code by interfering with Pellerin's access to his employment records and PSU documentation.

55. Pellerin is entitled to immediate access to his records and attorney fees under Labor Code § 1198.5.

## SIXTH CAUSE OF ACTION

[UNFAIR COMPETITION (Cal. Bus. & Prof. Code §17200)]

(As to All Defendants)

56. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

57. Defendants engaged in unlawful, unfair, and fraudulent business practices by:

    a. Engaging in corporate restructuring to avoid contractual obligations;

    b. Making false representations about PSU values and company performance;

    c. Retaliating against employees for exercising legal rights; and

    d. Violating employment and contract laws.

58. Defendants' conduct constitutes unfair competition under California Business and Professions Code section 17200.

59. Pellerin seeks restitution and injunctive relief to remedy Defendants' unfair business practices.

## SEVENTH CAUSE OF ACTION

[PROMISSORY ESTOPPEL]

(As to All Defendants)

60. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

61. Defendants promised Pellerin that his PSUs would be treated "as if" they constituted actual ownership for dividend purposes, inducing him to accept PSU compensation

in lieu of other opportunities.

62. Defendants knew Pellerin would rely on these promises in making career and financial decisions.

63. Pellerin reasonably and foreseeably relied on Defendants' promises by continuing his employment as the IOG Group's CTO, foregoing other opportunities, and structuring his financial affairs based on expected PSU dividends averaging over $239,000 annually.

64. Defendants' corporate restructuring extracting 80% of company value broke their clear and unambiguous promise.

65. Pellerin suffered detrimental reliance damages including lost income, foregone opportunities, and financial planning disruption.

66. Injustice can only be avoided by enforcing Defendants' promise to treat PSUs as 1% ownership.

### EIGHTH CAUSE OF ACTION

### [FRAUDULENT CONCEALMENT]

(As to All Defendants)

67. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

68. Defendants had exclusive knowledge of material facts regarding planned corporate restructuring that would drastically reduce PSU values.

69. Defendants intentionally concealed from Pellerin that they were extracting approximately 80% of the IOG Group's assets into a family office entity.

70. Defendants had a duty to disclose these material facts based on their fiduciary relationship with PSU holders and the PSU Agreement's terms.

71. Defendants concealed these facts with intent to defraud and induce Pellerin to continue employment without demanding fair compensation.

72. Pellerin was unaware of the concealed facts and would have acted differently had he known.

73. As a direct result of this concealment, Pellerin suffered damages exceeding

PELLERIN COMPLAINT                                    14

several million dollars.

74. Defendants' conduct was malicious, oppressive, and fraudulent, justifying punitive damages.

## NINTH CAUSE OF ACTION

### [CONVERSION]

(As to All Defendants)

75. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

76. Pellerin has a possessory right to his employment records, payroll documentation, and PSU records under California Labor Code § 1198.5.

77. Defendants wrongfully exercised dominion over these records by terminating Pellerin's access on July 18, 2025.

78. Pellerin has demanded return of access to his records, which Defendants have refused.

79. Defendants' interference with Pellerin's property rights was substantial, intentional, and without justification.

80. As a result, Pellerin has been damaged by inability to document his claims and prepare for mediation.

## TENTH CAUSE OF ACTION

### [UNJUST ENRICHMENT]

(As to All Defendants)

81. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

82. The PSU Agreement entitled Pellerin to dividend payments calculated "as if each Employee's percentage of PSUs specified in the Award Agreement constituted actual ownership of the Company."

83. Defendants received and retained the benefit of Pellerin's services as Chief Technology Officer from 2020-2025, during which the IOG Group's grew from 200 to 700

employees and generated substantial value.

84. Despite the PSU Agreement's requirement to treat Pellerin's 1% interest "as if" it were actual ownership, Defendants restructured corporate assets to divert approximately 80% of subsidiary profits to HFO while allocating only 20% to Employee Equity Funds.

85. This restructuring unjustly enriched Defendants by allowing them to retain profits that should have been distributed to Pellerin as 1% owner under the plain language of the PSU Agreement.

86. Defendants knew of and appreciated the benefit conferred by Pellerin's work in building the IOG Group's enterprise value while simultaneously engineering corporate structures to avoid paying him his contractual 1% share.

87. It would be inequitable and unconscionable to allow Defendants to retain the value created through Pellerin's efforts while circumventing their obligation to treat his PSUs as 1% actual ownership.

88. As a direct result, Defendants have been unjustly enriched in an amount exceeding several million dollars, representing the difference between 1% of total enterprise value and the reduced amounts actually distributed.

89. Pellerin is entitled to restitution of all benefits unjustly retained by Defendants.

## ELEVENTH CAUSE OF ACTION

### [DECLARATORY RELIEF]

(As to All Defendants)

90. Pellerin incorporates by reference all preceding allegations as though fully set forth herein.

91. An actual controversy exists between the parties regarding:

    a. The nature and extent of Pellerin's rights under the PSU Agreement;

    b. Whether corporate restructuring violated Defendants' obligations to PSU holders;

    c. The proper valuation method for PSU dividend calculations;

    d. The nature and extent of Pellerin's right to receive PSU payments for

     Changes in Control;

    e. Pellerin's entitlement to access employment records; and

    f. The nature and extent of Defendants' obligations to invest in Herd DAO.

92. Pellerin contends he is entitled to PSU treatment as 1% ownership without dilution from corporate restructuring.

93. Defendants contend they can unilaterally reduce PSU values through corporate maneuvers.

94. A judicial declaration is necessary to resolve this controversy and guide the parties' future conduct.

95. Pellerin seeks a declaration that: a. His PSUs must be valued as 1% of total enterprise value, not post-extraction value; b. Defendants breached their duties by extracting assets to avoid PSU obligations; c. Pellerin is entitled to immediate access to his employment records.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Compensatory damages in an amount exceeding several million dollars, to be proven at trial;

B. Punitive damages for Defendants' malicious, fraudulent, and oppressive conduct;

C. Restitution of amounts wrongfully obtained or withheld;

D. Attorney fees and costs as provided by law;

E. Pre- and post-judgment interest at the legal rate;

F. Injunctive relief as appropriate; and

G. Such other relief as the Court deems just and proper.

Dated: July 29, 2025           RUBINSTEIN LAW

                   By: *[signature]*
                   Yano L. Rubinstein
                   Kymberleigh N. Korpus

                   Attorneys for Plaintiff
                   ROMAIN PELLERIN

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury and, to that end, will post jury fees.

Dated: July 29, 2025                    RUBINSTEIN LAW

                                        By: /s/ Kymberleigh N. Korpus
                                        Yano L. Rubinstein
                                        Kymberleigh N. Korpus

                                        Attorneys for Plaintiff
                                        ROMAIN PELLERIN